Good morning and may it please the court. This morning this court has to review a single one-page order that has only two factual findings in it. Those two factual findings are, number one, that my client Innovation, the patentee in this case, either knew or should have known that its claims of infringement against Splash were baseless. And the second factual finding is that my client brought this suit for the sole purpose of harassing a small competitor. Now, with the pleasure of the court, I'd like to address that second factual finding first. Could I ask you a preliminary question? Yes. I don't understand why you dismissed your case and gave a covenant not to sue at a very early point when the district court hadn't even construed the claims yet. Was it a settlement between the parties? No, Your Honor, it was not a settlement. The reason I put this question to you is somebody from the outside looking at this point said, well, I had a case that they really didn't have much of a case to begin with. They didn't even wait until they found out how the court was going to construe the claim. Your Honor, the dismissal came about as a result of evaluation and reevaluation of the case, which should be done by parties as they're involved in a lawsuit. And at some point it became clear to my client that the risk of its patent and the risk of the money involved in fighting the case just did not justify any reward that could ultimately come out. And that's why the case was dismissed and the covenant not to sue was granted. It was just based on, as the case went along, there was evidence presented by Splash that raised, frankly, some issues that put our patent at risk. And so we were not aware of that information prior to filing suit or at any time earlier in the suit, and it just became a matter of risk versus reward. And, Your Honor, in finding an exceptional case and awarding attorney's fees, this court has made clear in the Brooks Furniture case that unless you have litigation misconduct, which is not an issue here, or unless you have misconduct during the prosecution of the patent itself, again, that's not an issue here, then there have to be two things that are found by the district court. And the district court didn't find either one of these to be supported, and both of these findings are clearly erroneous. The two things that Brooks requires are, number one, that the patentee acted in subjective bad faith, and number two, that the claim itself, the claim of infringement, is objectively baseless. Now, Your Honor, in order to decide whether the claim was objectively baseless, you have to reach the merits of the case. The district court had to reach the merits of the case, and it makes no difference whether this case comes up on appeal at this stage, meaning after, as you noted, Your Honor, halfway through the case, before the end, before it's gone through a full trial on the merits, or whether it comes up as of a full trial on the merits. The bottom line is the evidence in the case that would have been presented at trial has to be considered. And when you consider that evidence, there are essentially three things that Splash argues that makes this case objectively baseless. Number one, the issue of what is a dispersed stream as part of the claim language in Claim 1. And there was argument about what does dispersed stream mean, but there was no argument about the fact that dispersed stream meant a stream larger or a stream coming from an opening in the device that was larger than a standard syringe. The dispute, frankly, was over what is a standard syringe. And innovation started out with the belief that a standard syringe was an 18-gauge opening. Well, evidence was presented during discovery from Splash that showed that there are some standard syringes out there that have 16-gauge openings. Counsel, are you suggesting that at no point below did the opposing counsel argue that the claim was limited to an opening of a syringe without a needle? Your Honor, I'm not sure if Splash—are you asking if Splash argued that or innovation? We just said that never below was the dispute in the discussion and argument focused on whether it had to be larger than a standard syringe. At all times, it was simply over what gauge of needle. So by implication, I'm understanding you to argue that they never put forth that the claim construction ought to include a hole that has to be larger than a syringe without a needle attached to it. Am I wrong? Am I misunderstanding what you're saying? I'm trying to understand your argument and what was properly raised below. Yes, Your Honor. I'll try to clarify that. What was raised below, the argument of the district court, was what does disperse stream mean? And the argument was over what size opening must be present for the stream to emanate from. And my client had previously, in the Bionics litigation, had previously defined that term for purposes of 112. The issue in the Bionics litigation was indefiniteness. And so for purposes of 112, my client defined that opening as being larger than a standard syringe. When we got to this case, Splash was arguing that we had limited the claim to standard syringes to two. Without a needle attached. Yes, Your Honor. Okay. As I understand it, I have to say I'm not completely clear on that point because I was not involved in the trial of this case. But I believe that to be the case. But the bottom line is when you step back from the disperse stream language, it's frankly irrelevant whether it's a 16-gauge needle or opening or an 18-gauge needle because based on my client's measurements, the port's larger. Right. Their hole is larger either way. But that's only dependent on whether or not we believe that the word a syringe, in light of the disperse stream language earlier in the claim, means a syringe with a needle on the end. Because the only reason we get into gauges is if we get into the word syringe, which has to be interpreted in light of the spec and entitled in light of the language disperse stream earlier, means a syringe by itself or a syringe with a needle. That's the only way. Only time we have to get into the gauges. As you say, the gauges are irrelevant if we decide that a needle has to be attached. Your Honor, that's correct. And the bottom line is it is irrelevant. But why should it include a needle? When you, throughout the spec, when you talk about a syringe, you're talking about a syringe and then you always say with a needle and then you even talk about the various gauges of the needle. And very seldom if ever in the spec do I observe you talking about a syringe and meaning something that has a needle on the end without actually saying it separately. So since you chose throughout the spec to characterize a syringe as the device to which a needle is attached and then talk separately about the needle, why should I interpret the word syringe without reference to any needle in the claim as including a needle? Your Honor, that's the whole point. That issue was never addressed by the district court. We never got to the claim construction issue. Yes, but we're, this is a question of law and we're a court of appeal and we're capable of deciding questions of law in the first instance. Yes, Your Honor. So what, why should I decide that this first stream that has a port with a syringe, you know, it has a whole large needle on it, larger than that which can be achieved using a syringe, why should I conclude that that includes a needle? Because, Your Honor, the claim language doesn't say a syringe with a needle. Our argument below at the district court level was that it depends on the size of the opening. I mean, it's when you plunge, when you plunge the syringe. I'm confused. Aren't we the one arguing that it has to have a needle on it? No, Your Honor. We're not arguing that it has to have a needle. We're arguing for the size of the opening. And in fact, frankly, the size of the opening doesn't matter. What matters is what does the stream look like coming out of the needle? And so it may or may not have a needle. Well, clearly the size of the opening matters. Your claim language is wherein the area from which said stream emanates. So the size of the opening matters because your claim language is wherein the area from which said stream emanates, or the area which is context, is larger than that which can be achieved using a syringe. So the opening is what defines the dispersal stream. It does, Your Honor. And in this case, it did not matter whether that opening was a 16-gauge size. Only if I believe you that the syringe must have a needle on the end. Look, I'm reading this claim, and quite frankly, I look at this claim, and I see that you say the stream has to come from an area larger than that which can be achieved with a syringe with no needle on it. And I don't understand Splash's having conceded at any point that their device produces a stream larger than that which can be achieved with a syringe without a needle on it. I don't see you asserting that either. Your Honor, what we were asserting is that we measured the opening. We measured the opening in the Splash Cap device. And the Splash Cap device does not have a needle on it, obviously, because it's not a syringe. We measured that opening. And prior to filing this lawsuit, our patent attorney concluded that the opening was larger than the opening in a standard syringe. A standard syringe with a needle on the end of a certain gauge, not a standard syringe without a needle on the end, which necessarily has a much larger hole to it. Your Honor, the needle issue was not proposed by either party in the claim construction. If you go to page 8294 of the appendix, you'll see these are the claim constructions presented by both parties. And even if you look at Splash's proposed claim construction, you'll see that nowhere is there a discussion of a needle or no needle, nor is there an aqueous. The proposed construction of that claim, of the dispersed term, did not include any proposal regarding a needle. Both parties used terms produced by a syringe. We said syringe comprising an 18-gauge needle. We did propose a needle. But the important part was the opening. It wasn't whether there was a needle or not a needle. Well, certainly it matters, because if there's no needle on the end of a standard syringe, you would agree with me that the hole's much larger in there, or the dispersed stream would be much larger. Yes, Your Honor. It would be much larger. But clearly it matters. It does matter. But the key, again, was what does the stream look like coming out of the bottle, coming out of the device? And in our proposal and in our review prior to filing this lawsuit, we determined that the size of the splash cap could create and did create a dispersed stream. Now, can you tell me about your arguments with regards to the sterile language? Because the sterile language was added during prosecution, and as you are well aware, Festo creates a presumptive bar to anything that isn't sterile. Everything I've ever seen with regard to the accused device has non-sterile written across it, their website, the packaging, everything. So I'm troubled by your argument that only the solution needs to be sterile. Your Honor, that's what the plain language of the claim says. The language does not say that the splash cap device itself has to be sterile. And in fact, if you look at their brief, the splash is brief. But, counsel, when you included the word sterile in the argument, and if I understand it right, aren't you actually the person who prosecuted this? No, Your Honor. We were not. I'm the one who prosecuted it. Yes, Your Honor.  Yes, Your Honor. Okay, so I won't hold you personally accountable for any prosecution issues. But, okay, so the arguments that were made, though, during prosecution, and in fact in the specification, again, repeated during prosecution, was the notion that the application of sterile solution to wounds is critical. Well, if you stick sterile solution into a non-sterile environment, then you squirt it onto a wound, guess what? It's not sterile anymore. Is it? How could it possibly be sterile? Your Honor, it may not be sterile as applied to the wound. But that's what you argued during prosecution. So why wouldn't a Festo presumption vis-a-vis that argument? Even if I wasn't willing, if there wasn't an amendment, which there is here, which only makes it worse for me, but even if there wasn't an amendment, why wouldn't that argument bind you? Because, Your Honor, that's not the plain language. And I agree that… Do you understand the concept of argument-based estoppel? Yes, Your Honor, we do. But the issue was whether or not we believe the plain language of the claim could mean that the solution had to be in the bottle itself as sterile. And that's what we believe when we filed this lawsuit. Let me ask you before you sit down a different, quite different type of question. Yes, Your Honor. You want us to hold that the, as I understand it, the district court urged in saying this was an exceptional case. That's what you're asking us to hold. The answer to that seems to depend upon a large number of questions, including whether you had a reasonable basis for your interpretation of the patent, what was done in the pre-filing investigation, many of which are detailed, factual questions, and on which the district court made no findings at all. It made only a general finding that this was an exceptional case. And my question to you is, why shouldn't we send this case back to the district court to make findings on those issues which we can then examine to see if they are supported by the record, rather than ourselves engaging in these inquiries, which are traditionally done in the first instance by the district court. Why should we have to get into all of these questions when the district court hasn't expressed its views as specific? We don't know whether the district court, why in this case the district court concluded that it was an exceptional case. I mean, did he think the investigation was inadequate? Did he think the investigation was inadequate or it failed to disclose the flaws in the case? I don't know. We don't know. You're exactly right. Because you asked us to decide the case in your favor, and it would seem to me that a more appropriate disposition would be to send it back to the district court to vacate the judgment, to send it back to the district court to make findings on these issues and any others of things pertinent, and then on the basis of its new findings, to re-decide whether or not this is an exceptional case. Your Honor, that's our secondary proposal to this court. That's your argument. Your argument was better stated. I agree with it. There's not much more to say. You've exhausted all of your time. We will give you your vote on that. Thank you. Thank you, members. May it please the Court, the order that was issued. I think you should better start with Judge Friedman's question. About why not remand? Yeah. Because there's certainly no detailed findings of fact included in this order. I mean, it's seven sentences long, less than half a page, and that's double-spaced. I mean, we do know from the order that the district court judge concluded that you all showed by clear and convincing evidence that an innovation new or unreasonable investigation should have known its claims of infringement were baseless. But we don't know why. We don't know if it's the disbursed string language that Cummings had on or the sterile language or whatever else. So why not send it back to him and maybe articulate with particularity how he came to the conclusion that the infringement claims were baseless? I understand the question. I consider Judge Frasch's order a model of efficiency. He set forth the correct standard, clear and convincing evidence. He found that Splash had proven by clear and convincing evidence that the claim when filed was baseless. He also set forth in his order a finding that the suit was filed with subjective bad faith with the motivation of harassing a small competitor. What was the evidence for that? Well, you mean the evidence in the record? Because the record really does support that quite well. In fact, much of the evidence was developed by innovation during the deposition of Dr. Schultz when we sought to dismiss the case from Florida for improper venue. At that time, it was stated in the innovation's opposing brief that Splash Medical was a recently created Georgia company that had been in business just a few weeks before the lawsuit was filed. In their brief, innovation also stated that Splash sells a single product, operates out of Dr. Schultz's order. What's the evidence of her bringing the suit solely to harass? In addition to, well, two things in particular. One, there is a letter that is reproduced in the confidential portion of the appendix which innovation sent to its investors. And in that letter, they indicated that they did not regard Splash or they regarded Splash as being a small startup with limited resources for protracted litigation. In addition, there's also a declaration in the case by Dr. Schultz recounting a conversation between him and Dr. Racinski where Dr. Racinski told him that this case was going to cost Splash Medical millions. The other evidence of it is the fact that as set forth in LTAC by this court, where there is a frivolous claim that's presented, the court may infer bad faith. And for the reasons that have been elaborated already today before I stood up, there was no basis for bringing this claim. With respect to the question that Judge Friedman... I would assume that you would... I do want you to answer that, so I'm sorry I'm cutting off. I would assume that you would argue to us that even though the district court didn't articulate in the claim construction for disbursed stream in this Seventh Amendment order, and even though we didn't articulate the prosecution of Street Estoppel that may well apply here, both are questions of law that were fully briefed, fully raised, and that you can decide those in detail on appeal. Is that right? That is correct. And in addition, I believe that this court's decision in Carroll Touch supports the view that the record that is before the court can be considered to see that there was in fact support for the judge's decision and that there was no clear error. We can decide on these questions of law here, but that doesn't tell us what the district court was thinking. We're supposed to be reviewing what the district court was thinking. And we can't necessarily assume that they were thinking the same way we do, especially in the claim construction, when there's no rationality to that process at all. Well, I understand what you're saying, Your Honor, but I don't think, as Mr. Jones, my colleague, has tried to argue, that just because the district court didn't get far enough to issue its claim construction ruling doesn't mean that that precludes a finding that the case was brought in bad faith or that it was a baseless claim. Well, how do you think he reached the conclusion, though, that the infringement claim was baseless? What was the basis for his conclusion? The judge saw our device, both in person and by photographs, incorporated in Dr. Schultz's declarations. He saw a syringe that I demonstrated to him when we held a hearing. He also saw comparative photographs that were presented in Dr. Schultz's declaration. He could see that the tip of the splash cap device was smaller than that of a standard syringe. He could also see that the stream emitted by the splash cap device was smaller than the stream emitted by a standard syringe. He also knew from the specification of the patent itself, even without going into the file history, that the specification said that the way you get a dispersed stream is either you have multiple boards, kind of like a showerhead, or you have at least one board that's elongated that gives you an arc or a fan string. Correct, correct. Now, in the Bionics litigation, it was very clear... Do you think... Yeah, I put all that together before I got this. Do you think that the argument he made, the argument upon which he concluded the infringement claim was baseless was entirely the dispersed stream? What about the sterile argument? I mean, was all of that before him? That was all before him as well. Did he have the prosecution history before him? He had excerpts from the prosecution history. Yes, because you didn't give it to us, which made my job a lot harder. Yeah, it's not in the appendix. It's not in the appendix. That I apologize. Yeah. Do you know, does Innovation actually make any of these devices? My understanding, Your Honor, is that Innovation itself does not manufacture any products. It does have a related corporation, Euromax. Euromax is, I understand, the licensee of Innovation. Euromax does sell a competitive device that has multiple ports that issues a spray, like a shower head. It sells these devices that are made by someone else? It sells the, Euromax sells the devices which I believe Euromax either makes itself or has made for it. I'm curious about the statement by the court that the slaughter was filed solely for the purpose of harassing a small competitor and I wonder, depending on what it's done, is Splash a competitor? If you look at the Dear Investor letter in the confidential portion of the appendix, you will see that it talks about the impact of competitive products and you'll find that at the confidential appendix portion CA86 through CA90. And so clearly they were concerned about competition hurting their own product and the placement of their own product in the market. What do you say to this rather peculiar statement in the order after the first statement about how to show my clearance and convincing evidence, the court says, it appears to me that the slaughter was filed solely for this purpose. It appears to me, is that a finding or is that just sort of a casual comment by the judge on what looked like what was going on? It doesn't seem, it's not a traditional, if it were a traditional finding, you would have left off it appears to me. I suppose in every case, any time a district judge says something, you can say, well, that's how it appeared to the judge. Correct. But this seems to suggest to me that this was what the court was saying but was not going so far as a finding. My response would be that it's really no different than if the judge had said, in my opinion, it's still a finding. Obviously, that is the impression that was in the judge's mind. One thing that I'd like to address is that at this point where we are today, it's not our job to prove that the claim was baseless. The judge said that we did that by clear and convincing evidence. And I think it's improper for innovation to argue that we haven't met our burden. Clearly, Judge Thrash thought that we did. It is the burden of innovation before this court to show clear error. And clear error. I believe, Your Honor, that it is reviewable based upon the record that has been jointly submitted by the parties to this court. The record clearly supports Judge Thrash's conclusion that there was clear and convincing evidence that it was a baseless claim and also supports his finding that it was filed in bad faith. And innovation has failed to show that those findings are clearly erroneous. According to a fairly recent case by this court, a recent decision, Digio, a finding is clearly erroneous if this court is left with a definite and firm conviction that a mistake was committed down below. And we respectfully submit that there was no mistake and that such a definite and firm conviction should not be found. Well, I repeat to you what I've put to you before. Why should we, in the first instance, make these factual inquiries when the district court hasn't indicated its view on them? It may well be that if the district court had made factual findings on all of these issues, we'd have no doubt about whether those findings were clearly erroneous or not. We can't tell from the face of it what the judge took into consideration in determining that this was an exceptional case other than the general statement that it filed a suit without having any reasonable basis in believing it was a, quote, you know, a bad case. Correct. You know, I've reviewed the decisions of this court that have been issued in the past regarding meaningful review. And it appears to me that those cases where the court has been concerned about the order not allowing meaningful review have related to cases where there's been an inconsistency in the lower court's opinion. For example, in S.E. Johnson v. Carter Wallace, the district court had a specific finding of willful infringement and yet they found that the case was not exceptional. Or likewise, in Superior Fireplace v. Majestic Products, the lower court found that the claim was defective when the suit was filed before a certificate of correction had been obtained, that there were serious open questions about whether the patentee had a good faith belief that the claim was infringed and yet the court held that the case was not exceptional. Here there's no inconsistency. The order may be concise, but it certainly is consistent with itself and with the record. And for that reason, I don't believe that any more elaboration by Judge Thrash would really be helpful. One other point that I'd like to make, and that is I think that Innovation made an oversight when they were arguing to the court in their reply brief that this court in its Nasabka v. Delta Scientific decision affirmed a lower court's use of affidavits or declarations that were submitted upon a motion for reconsideration. In Nasabka, this court did not affirm the lower court's vacation of a sanctions award. The lower court vacated its own award after the appeal was filed, but before the briefs were filed with this court. And this court found that the appeal was therefore moot because it no longer needed to afford relief. In this case, the affidavit from patent attorney David Salowanshik was not presented to the lower court until after the court had issued its order approving the fees award, notwithstanding that the lower court had provided yet another opportunity before it issued its order by granting Innovation the right to file a surreply brief. In that surreply brief, Innovation argued that it did a valid prefiling investigation, but it did not attach any affidavits. It did not attach any testing documents. And the Salowanshik affidavit was just too little, too late. Again, this court does not, and did not in Nasabka, approve the belated support of prefiling investigation after the order is issued. I have little time left, and I'd like to close by reminding the court of the purpose of Section 285. The Senate report said that one of the purposes of this statute for awarding fees is to prevent gross injustice. And if there's been any case that deserves prevention of gross injustice, I think this is it. Section 285 is a deterrent to the bringing of clearly unwarranted suits, and this is one of them. This court stated in National Presto v. West Bend that Section 285 gives a trial court discretion to weigh the intangible evidence before it, as well as the tangible factors, and so that fee shifting can serve as an instrument of justice. And we suggest that this case particularly warrants that relief. Thank you. Thank you, Your Honor. I have just three quick points to make. The first thing is I need to clear up my discussion with Judge Moore in terms of the needle, because I believe I misstated it earlier. We did. Innovation did propose the definition of the first string based on the attachment of the needle to a syringe, and the needle was initially an 18-gauge size and then a 16-gauge size because of evidence that Splash presented that standard syringes had 16-gauge needles attached to them. But again, when we measured the device, it didn't matter because the opening in the Splash cap device, the infringing device, was larger than both the 16- or the 18-gauge needles. So I just wanted to clear that up. The second thing is really turning to the whole question of remand versus reversal. I believe that this court has the authority, obviously we have the authority, to reverse the case based on the lack of support and clearly erroneous factual findings. There are only two, and they're very brief, and if they are clearly erroneous, then this court has the power and the authority to reverse the case and find that there was an abuse of discretion. However, Judge Friedman, you've made a very good point. So you think that there's enough on the record for us to determine that the arguments and statements made were not sufficient to result in a basis case? Yes, Your Honor, and I believe, more importantly, the finding that there was subjective bad faith, which is required by Brooks Furniture, is simply not here. That finding in and of itself is clearly erroneous. So then you're telling me, though, that the district court's opinion gives us enough information to go to the record and be able to determine whether he was right or wrong or clearly erroneous? On those two factual findings, yes, Your Honor. On the baselessness? On the baselessness and the subjective bad faith. I mean, I'm assuming that the first fact finding that the new or should have known relates to the subjective bad faith prong of Brooks Furniture. Now, that may be an incorrect assumption on my part, but I read the first factual finding the district court judge made as relating to both the subjective bad faith and the objective baselessness of the claim. And Brooks Furniture says you have to have both. And in my opinion, there's clearly no subjective bad faith there. I mean, the innovation went to their patent attorney. The patent attorney concluded that there was infringement. And Splash has now raised the issue about the investor letter. Well, let me just read to you what the investor letter says. Twice in the investor letter, innovation says both companies, meaning one of the companies with Splash, have introduced products that we believe infringe on our U.S. patent rights. But in your brief, you argued that the findings can't be meaningfully reviewed. But now you're telling me they can and we should reverse. That's why I'm just a little taken aback. No, Your Honor. If we said the findings can't be meaningfully reviewed, then that's a misstatement. We believe that the judgment, that the exceptional case conclusion, cannot be meaningfully reviewed based on the two factual findings. You can certainly review the two factual findings and determine if those factual findings are clearly erroneous. So we can review the determination of whether or not the case is baseless and decide whether that was clearly erroneous. Yes. But to do that, then don't we have to determine the claim of destruction and the prosecution has to adopt those issues and all of that? Well, if you agree with Splash, you do. Because we are assuming some factual findings. We're assuming that the factual findings that went into the judge's order are over the first screen, sterile, and over the 7th of a pound per square inch.  Thank you, Your Honor. The case is submitted.